Good morning, your honors. Neil Levine on behalf of the appellates. I first wanted to thank the court for accommodating the scheduling change that we asked for. I'd also like to make note that in the gallery today we have a tribal chairman from the Havasupai tribe who journeyed here today for the argument. The Havasupai tribe is one of the appellates in this case. Welcome. It's a long way from the Havasupai reservation. It is, your honor. Thank you. The case, as the court is aware of, concerns the Arizona 1 uranium mine, which is located a few miles from Grand Canyon National Park on public lands managed and administered by the Bureau of Land Management. This mine was closed down for 20 years, or almost 20 years. It was approved in 1988, and operations began suddenly in December of 2009. During that intervening time frame, the operator, the original permittee, went bankrupt. The mine changed hands. The applicable regulations changed in 2000. Other changes were made to the way the mine was being operated. But BLM ---- There was not a new operating plan, though. No, absolutely not. And that's the reason for our case. That was the basis upon which Judge Campbell decided that they didn't need anything additionally done. Correct, your honor. It was both that, the failure to require and issue a new approval of a plan of operation, as well as the failure to comply with the NEPA through the supplemental NEPA process. Mr. Levine, was there ---- If there wasn't a new operating plan, was there any sort of a temporary plan between the time it was operating in 1988 and the time it reopened? My understanding is, is that ---- And this is sort of a ---- What about your understanding? What about the evidence? Fair enough. The operating plan included a few provisions that govern interim management. And it's important to note, too, that one of the things that the 2000 regulations imposed upon operators, and specifically plans of operations, are detailed components of these interim management plans. And that's one of the main problems with the fact that there was not a new requirement, is that the new requirements that came out in 2000 were not part of the plan that governs And continues to govern the Arizona 1 mine going forward. The other sort of main difference is ---- The 2000 regs, is your problem with them that they had additional requirements for the interim shutdown or additional requirements once the plan operated? Both. In the Section 3809-401, it has all these components of what needs to be in the plan, including what an interim management plan looks like. All right. But the plan is operating now. So problems with the interim management plan would seem to be by the board, aren't they? Fair enough. But there's other components that were included in the 2000 regs that are not part of the original 1988 plan. For example, and this is one of the big issues, too, comes up in NEPA, but the new regulations have provision 401B28, I believe, that calls for plans for roads. So any kind of access roads to a mine site have to be laid out and explained on how they're going to be managed, how they're going to be maintained. And that was not included in the 1988 plan. Is that relevant for our case, though? Because this road is already there. And the problem with this road is it was in bad condition, and they want to use gravel to make it in better condition. But it's not like we're going to make a new road through a forest. It's a road that's there, right? Except for the fact that Denison, the mining company, made clear to both BLM, the county, and the district court that it couldn't get to the mine, given the status and the way the road had been left in disrepair. So, in effect, they needed a new permit, which should have been part of the original plan of operations, but wasn't, in order for them to access the mine. They made clear in the record, in a document, a letter from Denison to BLM dated December 31, 2007, where they made clear to both BLM and the county that we cannot access the mine. Your position is to remind them that back in 1988, the operation plan should have said, Now, if this road, which we're planning to use now, gets out of maintenance, we intend to use gravel to repair it, and if that wasn't in, then you had to have a new plan of operation because the road had to be graveled? Well, I wouldn't go so far as they needed a whole new plan of operation, but that component of the plan lacked any detail about what would happen. It did not account for the fact that maintenance on this road would have to be done, and how would we deal with that? Where would we get the gravel? Would we be able to put gravel on a public road in order to maintain it? And this has significance because the way that the road was maintained subsequently had impacts, had adverse environmental impacts, and that's documented in our Volume 4 that was filed under seal. The way the road was maintained in 2008 and 2009, rehabilitated, caused adverse impacts, and that is sort of the crux of the issue. A lot of the new information that has come up since from 1988, when the original environmental assessment was adopted, until 2009, that's 20 years, or almost 20 years, and a lot of new information is out there, and that's why the failure of BLM to either approve a new plan of operations or go through a supplemental environmental analysis through NEPA in order to bring to light and to evaluate and use that information in a meaningful way in providing... Let me see if I can get to your point. The road was in bad condition because they hadn't been using the mine for years. They needed to put gravel on it so that they could get trucks back and forth on the road. In other words, they had to sort of fix the potholes. This had an adverse environmental impact on what, the gravel mine, that you took more gravel out of it? No, the road, the main access road is called Mount Trumbull Road. It's a 30-mile road that goes from the state highway down toward the mine, and grading and relocating parts of the road created adverse effects on the sides of the roads, and I don't want to go into any further detail, but it is in Volume 4, the details. There's declarations in there detailing the impacts of the maintenance activities. Let me just, I want to take a step back because I want to put this in context too. The argument under NEPA, Supplemental NEPA in particular, and the crux of the question that the District Court answered, was whether or not BLM has taken any additional major federal actions vis-à-vis the Arizona One Mining Project. It's our contention that the gravel permit that was issued for Denison to maintain and rehabilitate the access road was a major federal action that was required in order for them to operate, and we know it's a major federal action because BLM undertook a NEPA review process through the categorical exclusion that's in the record. That in and of itself is an admission that it was major federal action. Is it the road or the taking of the gravel that you're talking about now? It's the taking of the gravel that required a permit. And who was given the permit for that? The BLM issued the permit. To? To the Mojave County. So it wasn't to Denison. It was to the county, and that seemed to make a difference to Judge Campbell. The document that I referred to earlier, December 31, 2007, letter to BLM details expressly how Denison orchestrated the entire and orchestrated is probably not a fair word, but they worked with both the county and BLM in order to get the permit to the county and then allowing Denison to use the permit as a free source of gravel in order to rehabilitate this road. And that's where the categorical exclusion comes in? Correct. And that's just the excerpts of record 451 is that letter that I'm referring to. So that was one major federal action. The second major action. How is it a major federal action if it's categorically excluded? I'm sorry? How is it a major federal action if there's a categorical exclusion? I mean, categorical exclusion seems to me to suggest that this is not particularly major or significant. There's three ways that once you determine that NEPA applies to an action, there's three ways that there's three methods or procedures that apply. One is an EIS, an EA, and a categorical exclusion. For any of them to apply, first there has to be a determination that this is a major federal action.  But it is synonymous with significance, and that's in the regulation. So the word major is not something that's qualifying the type of action. Major federal action is defined in the 40 CFRs, 1508, 18, and it says any regulatory decision that authorizes an activity to go forward. So this fits in categorical, however it got there, it fits in categorical exclusion because it's less than, what, 50,000 tons, or I forgot what the measurement is, whatever the unit is, 50,000 units. And then the only way you get out of that exclusion is if it's extraordinary, right? Right. Okay. So you're arguing it's extraordinary? I am arguing that because of the cumulative effects of that. And this is a question that the BLM answered in the negative, which is, is this gravel permit related to mining operations and the Arizona One Mining Project? And it's our contention that based upon the letter that I referred to earlier, the fact that plans for access roads is a fundamental component of a mining operator's plan of operations. It has to be, the mining plan has to dictate or detail how access roads are going to be drawn up, where they're going to be maintained, as well as the fact that the permit itself says the purpose of this permit is for road maintenance. If you lose on the categorical exclusion, you lose on this point, if I understand your argument correctly. The BLM said that there was an extraordinary circumstance. And what is our test in determining whether the BLM was correct on its determination? The operative test. You have to show, what's your burden to show to win on the point? I have to show that the relationship between the gravel permit and the mine, or that mining operations beginning was reasonably foreseeable. Well, let me suggest that we're a little more narrow than that now. We're talking about this categorical exclusion. And it's considered appropriate factors taking in whether or not extraordinary circumstance. But when we get down to it, we're talking about an action of the BLM, that we're testing the BLM's determination. Don't you have to show that's arbitrary and capricious? I do, Your Honor. It's not a mistake, but it's arbitrary and capricious. And more specifically, I have to show that the record does not support the conclusion that the mine is not related to the gravel permit. The district court judge found that there was not a determination that it was arbitrary and capricious, right? Correct. Originally. Where was George Campbell wrong on that? Your Honor, the court originally found that the agency failed to support its conclusion that it was not related. He remanded it to the agency who then came back with a further explanation suggesting that it was completely unrelated. And we're saying that the record evidence shows that Dennison's only reason for that gravel permit was to get Arizona One operating again in 2009. And another key point here is that if the plan of operation from 1988 was enough to get going when they wanted to come back online, they would have started mining in 2007 because that's what they informed both BLM and the public and their shareholders, that they were going to begin operations late 2007, early 2008 under the 1988 operating plan. But for two years, they spent time getting additional approvals that were necessary in order to resume operations. One of those was they, under the 3809 regulations, they needed a new reclamation bond approved by BLM. And BLM approved that bond in the spring of 2008. That was another additional major federal action because without that action, mining could not occur. The regulations... The change was in the regulations. It was just getting some figures out and determining how much the bond is going to be. How is that a major federal action? Because under the regulatory definition of major federal action, the question is does the permittee or does the party need, as a prerequisite for beginning an activity, federal approval? Well, yes, but it seems to me pretty clear, and you can convince me otherwise, that it wasn't much of a major federal action. They had just changed the requirements of the bond and was just developing some figures, and that was it. That isn't much of a major federal action. But the test from Public Citizen, the Supreme Court case, precludes NEPA's compliance or applicability when there is no discretion on the part of the agency. And the discretion could go to a yes or no decision. Can the agency say no to that reclamation bond? It could also go on the amount of the bond or what types of reclamation could be accommodated through the reclamation bond. You'd ask the determination of how much the bond is going to cost is a major federal action requiring NEPA to have what? An environmental statement? Correct, Your Honor. On the amounts of money. It hasn't changed the result. It's just how much it's going to cost. Well, it's far more than the amounts of money. The regulations, again, at 3809.552b, talk about what factors the agency can consider in determining the amount of a reclamation bond, including applicable environmental standards. And in this case, it's important that they had done the analysis because in a 2010 USGS report that's in the record, the USGS determined that nearby uranium mines that were permitted originally in the 80s had shown high elevated levels of radioactivity in the soils surrounding these reclaimed mines, on the roads near these reclaimed mines, in the stream beds of these reclaimed mines, so that there's evidence that the reclamation that was approved back in 88 did not account for this new information that shows that the environmental impacts or the sufficiency of those old reclamation plans were not adequate. Are you talking about the information that we decided was post the decision in this case and decided not to recognize? No, Your Honor. Excerpts of Record 257 is the first page of this document to 89. And it predated that. It came out in, I want to say, March of 2010. I thought there was an analysis that this particular mine was in an area that did not have, that wasn't porous, that was rock, and that there wasn't the seepage issue. Correct, Your Honor. That was the information that comes from the 1988 plan. And new information shows that the rock is not as impermeable as first thought. I have two minutes left. I'd like to reserve the balance of my time, if I may. We'll give you two minutes, but I have a question I hadn't been able to get into. It's on a different subject. This case originally came to us when you applied for a preliminary injunction, which was denied by the district court, and then came to us and we affirmed the denial of the preliminary injunction. As I remember from reading that prior case, the issues there were very similar to those that we see now. As to those issues of law, such as whether there was a stopping of the operation so that a new permit were needed, I think that the court and we had to find that there wasn't a probability of success on your legal issues. To what extent, under our recent case of Gonzales v. Arizona, does that become law of the case and bind us as to any decisions on legal issues, such as does the Act require a new permit? Was there some error with respect to the gravel permit? I would say that the law of the case doctrine does not apply at all in this matter for several reasons. One is that the appellate court made no findings of law or fact in its ruling previously when the preliminary injunction was up on appeal. Preliminary injunctions do not generally have a binding effect on subsequent proceedings in the same case. That's not so. Unless there's a question of law, but there's nothing in the court's order from the prior time that resolves any of the legal issues that were raised. Your position is that since the appellate court made no determinations of law in affirming the denial of the preliminary injunction, we should disregard that ruling. There's nothing. I think it was a one- or two-line decision. Well, it was a one- or two-line decision saying denied. Right. So if it affirmed the denial of the preliminary injunction, I would assume that it did so on the grounds that the district court was correct, not that it was incorrect. I think that would be, on our part, speculating as to what was in the minds of the three judges on that. Thank you. You've answered my question. Thank you, Your Honor. Your position is the law of the case does not apply. Perhaps the appellate could address that at some point. The best case you have on your position is sports form. Is what? You can read it later. It's a very well-written case. Does that mean Your Honor wrote that case? I wrote it. I wrote it. Oh. May it please the Court. I'm Mark Hague from the Department of Justice, representing Secretary Salazar. Also at counsel table are Michael Kennedy and David DePippo, who represent the intervener, Denison Mines. Are you going to separate your time, or are you going to be the sole speaker? I guess the intent was that I would be the sole speaker unless the Court has questions for Mr. Kennedy, and he would give us right here. I guess I will begin with the dispute over BLM's interpretation of its regulations, and then turn to CBD's NEPA claims. CBD's argument that the mining plan of operations became ineffective when Denison's predecessor temporarily suspended mining is inconsistent with the language of several sections of the regulations. It's inconsistent with BLM's stated intent when it adopted the regulations. It produces unworkable results and uncertainty about when a mining plan of operations is or isn't in effect. And it's simply not a plausible reading of the regulations. When BLM adopted the regulation in the preamble to the regulation, it said that its intent in section 423 was that a mining plan of operations is good for the life of the project as described in the plan. The actual language of the regulation is a little bit confusing, I would acknowledge, because the term operations is used in a couple of different ways in the regulation. But when you move from section 423 to 424, it becomes very clear what happens when active mining is not taking place. And section 424 makes clear that the mining plan of operations doesn't immediately become ineffective, but rather additional steps may lead to BLM suspending it or revoking it. And in the interim, when the operator is not actively mining, it has to comply with the MPO, the mining plan of operations. I think your reading of the regulations makes a lot of sense. I'm confused about a couple of things, and that is at some point, I think the way the regulations work is BLM can say something has happened, and it doesn't automatically the permit, but it can come in and say we want to withdraw the permit here because things have changed, something has happened. I think, as I understood the argument this morning, maybe I got it wrong, I think he's arguing that one of the things that happened was 2000 regulations, which are stricter, make new requirements, and BLM was arbitrary in not paying any attention to that. I think that's what he was saying. I'm not sure. Well, to the extent that that's their argument, the regulations don't support that because the new regulations grandfather in pre-existing MPOs. So if you had a mining plan of operations that was in effect prior to, I don't remember whether the date is 2000 or 2001, there are some mostly procedural provisions of the new apply, but you're not required, but you can continue to rely on your MPO until you're done. And that's really the intent of the regulations here in terms of the life of the MPO. It's kind of the... You say until you're done. Is there some provision in the MPO which requires the mining company or the permittee to notify the BLM when they're done? I'm not sure, Your Honor. I think in order to get the... I know that in terms of they have to post a financial guarantee, and in terms of the release of that financial guarantee, they don't get that until they demonstrate that all of the reclamation that's required by the regulations and the MPO has been completed to BLM satisfaction. So the financial guarantee was alive and well during the 20 years that mining operations were temporarily suspended? Yes. Yes. And during that time that the operations were temporarily suspended, BLM was conducting site visits on almost an annual basis. Most years, someone went out and looked at the facility. In addition, during that time, Denison was also... Or Denison's predecessor, and then Denison, was required to comply with applicable Clean Air Act permitting requirements, Clean Water Act permits, state groundwater permits. So all of those requirements remained in effect. Was that happening during the shutdown period, or only when they wanted to start up again the permitting business? I believe that during the shutdown, some of those permits expired, and Denison, when it then reinitiated mining, had to renew those permits. But you don't take it that renewing of the permits is the type of action that requires some type of assessment? Well, it may, but it doesn't reopen the original decision in 1988. They had to obtain an Air Act permit, but the Clean Air Act has a NEPA exclusion. So EPA was not required to do a NEPA analysis on issuance of the air permit. But if Denison had modified the plan of operations or was attempting to undertake something new, it would have to come in and get BLM approval. And at that point, NEPA, depending on what Denison was proposing, NEPA could be triggered and there might need to be an EIS or there might need to be an EA. But the fact that there's a new action, I mean, and the gravel permit is the example of that. BLM did comply with NEPA in determining whether to approve the gravel permit, and it approved it under the categorical exclusion. But the decision whether or not to issue a gravel permit in 2008 does not mean that the agency reopens the decision that it made in 1988. Because this is a new act. Because this is a new act. But if there's no new act, then everything from the original permit carries on over the 20-year period. That's your position? Yes. Yes. Mr. Hague, a couple of points that were made by Mr. Levine. Mr. Levine, do you agree or do you disagree with his contention that in order to determine that the gravel permit was a subject of categorical exclusion, to start that process, the BLM first had to determine that the gravel permit was a major Federal action, if I understood him correctly. I understand your question. I don't know that there has to be a formal determination. BLM did proceed on the assumption that this was a major Federal action. And Mr. Levine is correct. Major Federal action significantly affecting the quality of the human environment is all one big phrase that doesn't get split out. So BLM and the way that the question is, does it fall within a categorical exclusion? Well, if it is a major Federal action, then isn't Mr. Levine correct that a supplemental NEPA report must be made? Well, that so then the question is, does it fall within a categorical exclusion? If it does, then the next question is, are there extraordinary circumstances? If not, you're done. You have satisfied the agency. At that point, the agency has satisfied its obligations under NEPA. Let's say abused their discretion. Right. Right. Now, the second issue that he brought up was, if I understood him correctly, was to show arbitrary and capricious determination as to the gravel permit. The district court found that the gravel permit was completely unrelated to the operation of the mine. Did I misunderstand him on that? I think that's what the district court found. I think for purposes of NEPA, the decision whether to authorize gravel mining at this public use area, which is about 20 road miles from the actual mine, was unconnected with the operation of the mine. And then that's BLM's rationale in explaining why this was an unconnected action. Isn't there also a purpose of the road to allow access to the mine? Well, I guess there are a couple of things that need to be cleared up there. The term access road has been used in the briefs, and it's not always accurate. Mount Trumbull Road is a public road. The county, Mojave County, got a right of way for that road in 1986 from BLM. It's open to the public. It's used by Denison and by members of the public to access many different sites on the Arizona Strip. Branching off of Mount Trumbull Road, which is maybe, I believe, 30 miles, are much shorter access roads from Mount Trumbull Road to the mines. When the mining plan of operations talks about mine access and access roads, they're talking about these access roads off of Mount Trumbull Road. It is true that Mount Trumbull Road provides access to the access road, but Mount Trumbull Road is a public road used by members of the public. The county had been maintaining the road, but had not been devoting much time or effort to maintenance. When Denison started using heavy trucks on the road, there were complaints, including complaints from some of the plaintiff groups, that the road was getting damaged. As a result, we got the gravel permit, which was to enable Mojave County to get gravel, and then Mojave County designated Denison as its agent to do the road masons. I guess Mr. Levine said one thing about the significance of this work on the road, that this raised new concerns. He said that there was grading and that there was also relocation of the road. That's not correct. The road has not been relocated. The right-of-way has not been changed. BLM's authorization to the county was for a right-of-way. And BLM has not authorized any change in the location of that right-of-way. The maintenance that's going on is putting gravel in potholes, filling in places that have been washed out with the passage of time. Would you mind explaining to me your position on this bond? As I understand it, this reclamation bond is to take care of putting everything back to normal after they finish the mining. That's correct. And then at one point, it was considered whether or not the bond was correct. There had been changes, as I understand it, in what's required, and there was great consideration of that. It strikes me that it's important and that it could be very significant. Counsel says that there was a major Federal action because of that. As I understand, Judge Campbell, he says, no, it's just number crunching and coming up with a different amount. I'm not sure I fully understand it. Could you give me your position? Yes, Your Honor. It is number crunching. The criteria that BLM uses in determining the amount of the financial guarantee are built into a computer program that's based on how many acres of disturbance, how many cubic yards of rock have been moved. And that comes up with the cost of putting the site, of reclaiming the site, of putting the site back together. The ‑‑ I'm sorry. I lost my train of thought. Is it major Federal action to do the number crunching? No, it's not, Your Honor, because it doesn't have any direct impact on the ground, on the environment. It's a financial transaction. Oh, and I know what I was going to say. The existing MPO and the regulations specifically provide that from time to time, BLM is going to review the bonds and update them. That's 3809.552B. So the fact that the bond was reviewed and the amounts were updated is nothing that was not contemplated at the time the original Mining Plan of Operations was approved. This is just ordinary implementation of the existing regulations and of the existing plan. So it's not a new major Federal action, or it's not a major Federal action at all. You know, maybe I don't understand this, but it seems to me everything hinges on the existing MPO being a good existing MPO. What is it in the world of mining or BLM that would cause an existing MPO to evaporate? Is there anything? No, there is not. BLM can take action to suspend or terminate an MPO, but they don't automatically disappear. Okay. What kind of thing? Is that too simple? What causes them to suspend an MPO? Well, the regulations lay out the steps, the enforcement process, but basically noncompliance with the MPO, noncompliance with applicable regulations, or operating in a way that causes unnecessary or undue degradation. And if they found cause to suspend, does suspend mean, okay, you clean up your act and the existing MPO goes back into force, or then do you have to get a new MPO? Suspend means you can't operate anymore until you cure the problem and then the MPO goes back, and then you can continue to operate. Revoke means it's gone and you have to apply again. I got it. Thank you. And the, I guess to just sort of pick up on that and make a slightly broader point, the regulations, the preamble to the regulations, MPOs are valuable commodities to miners, and the regulations contemplate that once you go through the fairly elaborate process of complying with the requirements, getting the MPO, the agency does the NEPA analysis, that that plan is then going to be good, that you will be able to suspend operations, suspend active mining as necessary, as the market changes, for seasonal reasons, for whatever reasons, and then resume active mining. I'm not very familiar with mining. Is this period of suspension extraordinary? I think it's a little bit longer than most, but I don't think that it's extraordinary, and it is definitely commonplace that for some types of minerals, the market goes down, they stop. The market comes back, they go back to work. All right. Thank you very much. Thank you. Your Honor, would it be possible for me to use the remaining minute and 22 seconds? Please state your appearance for the record. Thank you. Michael Kennedy for Denison, Your Honor. I wanted to, Judge B, answer your question about law of the case. It was a brief denial when we were here last, but the denial specifically affirmed the action of the lower court for reasons stated by the district court judge. And it specifically says that appellants failed to raise serious questions on the merits of their claims, a violation of NEPA and the Federal Land Policy Management Act. So that was a specific finding. So with no new arguments and that those are issues of law, we do have indeed a law of the case situation. You've tried to be very specific in sports form that that's not the law in the Ninth Circuit. What's your response to our outline in sports form? I'm not able to respond to that, Your Honor, is the candid answer. This came up, and we argued it. We didn't cite sports form. But I believe that this is more than just a quick denial or one-line affirmation. Their expressed findings made is really the point that I was making. And if that falls short of sports form, then my mistake. But it is more than just a simple denial. There were specific reasons stated by the court and adoption in toto of the district court's decision. Thank you very much, Mr. Kennedy. Mr. Levine, you have some time left. Two minutes. I just wanted to touch on, if I may, the notion that the overriding theme here is that BLM sought to do as little as possible to get this mine back online after 20 years. And the construction that BLM is offering of its regulations provides no meaning to the operative provision, sub-provision, that is relevant here, which is Section 423, which says that, and it gives the powers totally within the operator's discretion to determine how long that plan of operation survives. It says as long as you are operating, as long as you are conducting operations, your plan is good. If we allow the construction that's being offered by BLM, that provision has no meaning. And the district court was not able to give a valid meaning to it, and government has never offered any meaning to Section 423, which was promulgated in 2000 for the express purpose to prevent plans of operations from being in existence indefinitely. And that's in the preamble to the 2000 regulations. And what we're looking at here, there are several other mines that are similarly situated in that they're around the Grand Canyon. There's one in the South Rim. There's three or four in the North Rim. And these are all plans that were approved in the 80s. And they have suddenly sprung back to life here in the last couple of years. And, I mean, I use this sort of nomenclature. I apologize. But these are like zombie plans. They just keep coming up. And they could come up 50 years from now. And it's like a little kid pulling out a ticket from his shoe. They find him in their sock. They're all crumpled. And suddenly, hey, I got a ticket to get into the movie theater. I understand the concern that you have for your clients. I have a feeling for it. I've backpacked through the Grand Canyon. It's a beautiful area. You don't want to disturb. But a decision had to be made as to how this is going to take place and right or wrong. The government has given the operation of making those decisions to the Bureau. And it seems to me that when they've done that, you can't just say, well, it's very easy to make a decision on the merits. You have to show the Bureau abused its discretion. And that seems to me to be the harder part. Is there any part of this case that you're presenting that isn't an abuse of discretion standard? Your Honor, I think with respect to the 3809 regulations, it involves an interpretation by the agency. And the general rule, as the Court knows, is deference to the agency when they're interpreting their own regulations, unless it's contrary to the plain meaning of the regulation or the intent of the regulation or if it renders a provision superfluous without meaning. And it's our position that 423 has no meaning rendered superfluous, and it undermines the express purpose of this provision. If plans of operations that were approved conducting operations ceased, in this case for 17 or 19 years, depending upon how you read the record, and then suddenly come back to life. And it's not our position that mining cannot occur necessarily. But the question is, does BLM have to go through a different process in 2010 to reflect the current situation? And that's our position. And the regulations contemplated the outcome that they would do that. They would reapprove a plan before it begins reoperating. Are you suggesting any particular time periods that would trigger an interpretation of 423 as you desire? For instance, would 5 years of suspension be all right, but not 7 or 10 or 12? I think that is a question that's difficult to answer. I think in this case. You're asking us to answer it. And we've presented facts to you that say 17 years is what happened here. 19 years is when the mine shut down in 1990 and reopened in 2009. And so under those circumstances, the answer is yes. Another way of looking at it is the mining operation plan is all right until BLM approves some new regulations in 2000? There you are. I think the question is really about the degree of approval or what modifications are necessary that consider what happened during those 19 years so that in this case we had 19 years of inactivity. What's changed? What needs to be modified in the plan? What has to be done to get mining operations going again? But the position should make sense. At what point? It's almost you're asking us how long is the string. Is it 5? Is it 15? You say 20 it should be. But somebody's got to make a decision. You can't go over 5 years so you have to have a new of inactivity or you have to have a new plan of operation. It just seems to me that it's difficult that we would consider other than this discretion was given to the BLM. And if you get there, then it makes it much more difficult for your case. I'm not saying you're out, but the standard review could be very important here. Well, I appreciate where the court's coming from. I really do. I think this has been a tough question. But the facts of this case are 17 years. But putting that aside, the difference between how long it takes for them being closed will inform the level of review for a new plan of operation so that if, in fact, it's been just two years and nothing's changed, then the approval could be rather ministerial and it could just go through. But if it's a significant period of time where lots has changed. Let's get to what has changed. In 17 years, it wouldn't change in two years. Well, I think it's a fact. I mean, what was the evidence of the change which makes the decision not to have a new operating plan arbitrary and capricious? Well, one of the things that BLM must consider is who is the operator. That's in the regulations. Well, it always changes if one goes to another, right? It may. And if you look back on it, and it's in our briefs, but if you look back on the original approval, one of the things they considered was who the operator was, what kind of history they have in this region from a mining perspective. Do they have a bad actor or are they a good actor? That can happen in a month. It could. So that's what I'm saying. It's not a time specific. It's a factor specific. And what has changed? You know, in here at Arizona One, one of the things that's changed is that the California condor was reintroduced to the region in 1996. That's changed, and whether or not there's going to be impacts to the California condor in this region. Like I said earlier, the 2010 USGS report determined that past efforts of reclamation had not been successful, that we had elevated levels of contamination in the soils. So it's more of a factor question on a case-by-case basis that BLM has the discretion to use rather than a duration question. Okay. Thank you very much. Thank you, Your Honor. Sorry we ran over time. It's all right. We're going to take our break because we ran over time a little bit. We're going to take our break now rather than later. So we'll adjourn for 10 minutes. Thank you very much.
judges: Restani, Wallace, Bea